Good morning, and may it please the court, I'm Merlene Randall and I represent the plaintiffs Mark Johnson, Michael Bryant, and Franco Casilan. We are here today to ask the court to reverse a motion for summary judgment that was granted in this manner in the district court. This case concerns a firefighter examination that was administered in the City and County of San Francisco in 2008. At that time it had been approximately Counsel, could you help me on a detail of the facts that I need to understand the law? I was trying to identify the specific employment practice that caused the disparate impact and the best I could do was that the specific employment practice is hiring in order of the list of test scores. Is that correct? The practice that is being challenged is the selection rate that was the chief. That's a much broader statement than I just made and that's why I need help. The practice that is being challenged is the promotions that were made in rank order by the chief. The method by which she made the promotions resulted in disparate impact against African Americans and so that's the practice that I need help with challenging the promotions. What I'm trying to narrow down is I don't think your challenges to the test itself, because that would be time-barred, and I don't think you're challenging the first set of promotions because that would be time-barred. I think you're challenging subsequent promotions that would not be time-barred, and since the challenge to giving the test as it was would be, the challenge must be to going down the list in order. But I'm not clear on whether I understand the challenge correctly and that's what I need help on. I understand now. Do I understand it correctly? What we're challenging are specific appointments that were made by the chief within a statutory period of time, and we are following the dictates of Lewis versus Chicago. Because the chief made continuous appointments starting in July through 2011, my clients are challenging the specific appointments that were made in 2010. She made appointments beginning July 2008, and she continued to make appointments thereafter periodically until 2011, I believe July of 2011. And she made a particular appointment, I believe, in may have been June of 2009. I do have the EEOC claims here. And my clients, Mike, Mark Johnson, and Franco Casali, filed a new claim challenging those specific appointments. Well, the discharge submissions to the EEOC the second time around were identical to the first round submitted to the EEOC. So what do you make of the district court's analysis that if the plaintiffs are allowed to proceed in this case, it would really render the 90 days useless? Firstly, they are not identical. I disagree with that analysis. If the first claims that were filed by the plaintiffs allege different dates as regards the act of discrimination, because in employment and systematic practice cases, you can allege the statute is renewed each time an appointment is made. So you can allege a discrete time or discrete appointment as the act of discrimination. And that's what we did here. Originally, when the EEOC charges were filed, the plaintiffs alleged specific times that they were challenging. And I think that was shortly after the exam. One of the EEOC charges has a date, I believe, of June 2008, and the other one has a March 2008 date on it. And Mr. Brian, Michael Brian, I'm not sure if he even had a date on his original charge. But they were alleging different periods of time. It's almost like a balance sheet. It's like where were we at that time? And the law says that you can, for example, in Lewis v. Chicago, one of the issues was the defendant asked the court, they mentioned that when we came up with our promotional list, clearly at that time it was disparate impact, and that the plaintiffs could have filed a lawsuit, but they didn't. And the court said, yes, that was disparate impact, but they didn't go into court on that. So we're not concerned with that anymore. What we're looking at is down the line, the defendant continued that statute to run again. So what we are ‑‑ So you're saying discrete time periods are alleged, and that's what distinguishes the second. Yes. And we're saying that we're alleging a different appointment. A different candidate was appointed, and we're saying ‑‑ All right. No, I've got your argument. With regard to your disparate impact, the district court indicated in its order, and I'm looking at footnote 1 if you want to reference it, that plaintiffs' only response to the evidence in the record that banding is utilized is attorney argument that the chief actually only made appointments off the examination list in rank order. And so the district court did not think that there was any factual evidence in the record that rank order promotion practice was ever made. Do you have anything that you want to cite me to the record that shows that, in fact, that the chief made rank order promotions? We do have actual records in ‑‑ okay. In the ‑‑ it's the chief's declaration, and it's the exhibit record number is 120 through 129. And the chief states in her declaration that she made the ‑‑ I'm sorry. If you can, I stepped away from the mic. She states that she made appointments beginning in July of 2008, and attached to that declaration is what we call an eligible list that ranks the candidates from the highest score to the lowest score. And then if you look at the last page of that document, it has exhibit B before 129, you'll see the appointments that were actually made by the chief. And if you compare those to ‑‑ if you compare those appointments to the eligible list, you'll see that she made appointments completely in rank order in accordance with scores, from the highest score to the lowest score. So what you're saying, despite the explanation, is that it's really the banding. So basically, there's a declaration indicating that the next promotion that comes up, everybody within this band of, I think it was anybody with a score of 917, all the way down to 845, that those would be eligible. You're saying that the actual evidence points to the contrary conclusion that it was in rank order. Yes. By looking at past appointments. That's the argument. My argument in the evidence is that she made the appointments in rank order. Although she had the authority to go within a band, she chose not to go within the band. But instead, she made the appointments in rank order. If the chiefs had gone within the band, which would have extended the score 74 points, she could have appointed Mark Johnson and Mike Bryan in the first round of appointments, but she chose not to. So the fact that she had the power to do it within the band and chose not to should not benefit the defendant, because as this State has said in previous occasions in this district, that what the appointees are looking for are appointments and not places on the list. And this Court and the U.S. Supreme Court and the EEOC rules have said that the selection rate is what is to be used as the guide point for disparate impact. Not the ---- I'm sorry. Counsel. Yes. I think you've got very solid evidence in the record that supports what you just said, that she just went down the list. And that banding business is irrelevant because it's not what the chief did. Okay. And if you go down the list, it appears that, as your expert said, the appointments failed to satisfy what the EEOC calls its rule of thumb, its 80 percent rule of thumb. My question is about our Contreras case. In our Contreras case, we said it's not enough to show disparate impact where the EEOC rule of thumb isn't satisfied if the sample is too small. And it looks like in Contreras, there was actually a stronger case for disparate impact than there is here. In this case, on one of the years, the 80 percent rule, which isn't law, it's just the EEOC rule of thumb, would have been satisfied if one white appointment had gone to a black person and in the other year was if two white appointments had gone to black persons, I think. And it's a very small sample. Everybody was eligible, but it's still, I can't remember exactly, 48 applicants. Everybody's eligible who takes the test. So why doesn't Contreras compel a decision for the appellee under that small sample size and not that great a disparate impact principle? In this particular case, I believe there is a larger sample size. It's 63, I believe, as opposed to 40. There were 63, at least 63 candidates on the list. Also, my expert did an analysis. I thought white and black applicants combined were 48. It was 63? On the list of the eligibles in this case? It doesn't matter. It's still in the same area. I believe it was 63. Okay. I could go back and count them, but I believe there were 63. You know the case better than I do. I'm sure you're right. There were at least 63 people who, because everybody who took the examination made the eligible list. And that is why it is a position that it has to be the selection rate consistent with the other. But getting back to your question. Sure. Taking the test puts you on the eligible list. Getting back to your question, Your Honor, about the small sample size, I had an expert who is an economist and a Ph.D. to do not only the analysis under the rule of thumb, 80% rule, but he also did an analysis under the standard deviation rule, where the it appears that in the case law, the courts are moving more toward standard deviation. I think they look at both. Right. They look at both. Statistical significance and standard deviation. Yes. Small sample size defeats statistical significance. Right. And so in this case, we did standard deviation. And we found that in each case, we did it on three different analysis with three different appointments related to the appointments that we are using as the discriminatory act. And at each point, we found not only a violation of the 80% rule, but we found a violation of the standard deviation. Because under the cases except that anything over a two-point standard deviation is statistically significant and would indicate that the results are out of the norm and are related to some other act outside of the normal circumstances. And in this case, we are saying it's the fact that the test was not job related. In each case, there was ‑‑ I think I could give you the exact ‑‑ I think the first analysis was 50, at least 51% out of the 80% rule. The next appointment was around 53% out of far below the 80% rule. And it was a standard deviation in the first analysis of 2.7. I could give you the exact number. The second appointment was a little over 2. And the third appointment was a standard deviation of 3.01, thereabouts. And my expert, if you were here, he could tell you, and I'm not an economist, but he did extra steps to make sure that this was not an anomaly, but this was actually statistically relevant, keeping in mind that ‑‑ keeping in mind the sample size. And also, there of course most recently are even what small groups are looking at stacking, in other words, if it's a very small sample size, but all of the minorities are coming in at the end of the list. There's been a recent case in New York that found disparate impact just based on that clustering at the bottom of the list. But here they don't cluster. I mean, I think ‑‑ I think, Gus, of your three clients, two have been promoted to the position, haven't they? Of my two clients, three was promoted approximately three years after the exam. And as this Court has said, that that doesn't defeat disparate impact, it just means that the damages would be affected because his ‑‑ their appointments were delayed. Also, the third ‑‑ my third client, Franco Calzillai, has not been promoted. And if the chief had used banding, he could have been promoted in the second wave of appointments, but she chose not to. The chief was also aware of the disparate impact because at the time of the first two appointments, the city did a disparate impact analysis under the 80 percent rule that showed that all minorities suffered a disparate impact. How is this case worse in terms of disparate impact than the Contreras case, which went against the challengers? I would have to say I would need to take a closer look at that case to compare it to the facts of our case. I would also like to indicate that the city's own expert admitted that it was disparate impact. He testified to that in his deposition in 2011. They had a report done in 2008 that showed disparate impact. So they conceded that it was disparate impact. It was only until the motion for summary judgment that the city took a position that if you made the eligible list, then you could never complain of disparate impact, which would have no basis in reality, because all an employee would have to do would be put everybody on the eligible list. All right. Thank you, counsel.  Good morning, Your Honors. My name is Jonathan Rolnick. I'm a deputy city attorney, and I'm here representing the city and county of San Francisco. I'd like to focus on two issues this morning. First, that the 2008 promotional exam for Battalion Chief did not have a statistical disparate impact on the appellants or other African-American candidates. Second ---- Counsel, does it matter? It looks to me like all the cases about, because of what's time barred and what isn't time barred, is simply going down the list as the method of promotion, not the nature of the test. Well, that's not the way I understand the appellant's challenge here. But let me touch on that factual issue about rank order. It's as though we hired our law clerks by just going down the LSAT list. I think if you actually look carefully at what the evidence is, it demonstrates that the chief did not go in rank order, and you find that by looking at the excerpts of record with her declaration. That's her declaration. Well, in her declaration it says that, but counsel pointed out that if you actually compare the people promoted to the examination result list, the eligibility list, you can see that the actual promotions were made in rank order. So how do you respond to that? I would respond by looking very carefully at the promotions versus the rank order of the list. Because when you look at the final set of promotions that are essentially at issue here, which happened around May of 2001, that resulted in the promotion of two of the appellants here, at that point in time the chief actually skipped over four of the candidates who were on the list. And those four candidates, I will tell you who they are. Kearney, Denti, Imbolino, and Brady. You mean the one time she deviated from just going straight down the list was to skip over four whites and appoint two blacks? That is the – as far as I know, that is when she went down the list. But let me make another point here. The chief had discretion within the list. And what the evidence show is the promotions on a particular day. What we don't have is when the chief made the initial set of promotions of 25, although the list we provided shows the applicants in alphabetical order in the date of promotion, it doesn't show her promotional decision-making process. So when she made the first 25, we don't know if she started off by saying, I think candidate three is the best candidate, and then five, and then seven, and then one, and then two. We don't have that evidence here. So the evidence does show that ultimately the people on the list were picked up. But it doesn't demonstrate that, in fact, she just simply went down the checklist saying one, two, three, four, five. And these May 2011 promotions demonstrate that she didn't go in that order. She skipped these four individuals. And in July of 2011, a couple months after the promotions of Battalion Chief Johnson and Bryant, when she actually could make those promotions permanent, she went back up in July two months later and then gave Battalion Chief Kearney a promotion. So I don't think the evidence supports that it was in rank order. You started your argument saying that there's no statistical significance that would demonstrate disparate impact. Can you get back to that? Yes, I would like to get back to that. And I'd like to focus again on what I just talked about with respect to the Chief's declaration, but also talk about the appellant's expert declaration. If you look at his final analysis, which he calls the Crimin analysis, which concerns these May 2011 promotions, he says in there that I simply toted up all of the people, all the individuals on the list from the person top of the list all the way down to Crimin. That's 46 individuals. But if you look at the Chief's declaration, you'll see that there were only 42 promotions actually made. So his analysis is crediting four additional promotions of white candidates that never occurred. And so if you look at that with the actual evidence and you do his analysis, in fact, the city meets the 80 percent rule. You mean he just made an arithmetic error? He made an arithmetic error. And it shows that, in fact, the selection rate for African Americans was approximately 82 percent as compared to whites. And as Your Honor previously pointed out, even if we accept the appellant's expert's statistical analysis, it only takes a flip-flop of one candidate to go from one side of the four-fifths 80 percent rule to the other side of that rule. And the same thing happens with respect to the two other samples that he gives you. If you flip-flop one or two candidates, you go from one side of the four-fifths rule to the other side. In fact, in one case, if you flip-flop two, you go from, I think it's 60 or 70 percent up to 95 percent. Can I ask you one thing? I guess I thought the district court relied on — you're not even going to talk about timeliness, I guess, right? You just want to skip over that? Well, I think the judge got it right on the timeliness issue, and I would — I would say in response — Well, I mean, Lewis just strikes me as totally irreconcilable with the district court's ruling here. And Lewis, I believe, Your Honor, touches on a different issue, and that's whether — whether an initial claim is timely. Here we have two identical claims. So? They get a right to sue. Fine. So their damages are going to be cut off. So what? That's — that's, you know, you should be happy about that, right? We certainly are happy. We would be most happy if we have an affirmance here. But what I would say is there's nothing new in the second claim. I don't think that matters. I mean, discriminate against me in 1970, I'll forget about it. Do it again in 1975, I'm tired of forgetting about it. And now I'm going to sue you timely. Why — why can't you do that under Lewis? You can't sue twice over the 1970 discrimination. But if you're discriminated against again in 1975, why can't you? I made up arbitrary dates that don't mean anything. I would say the distinction here is that if you come forward and say the original complaint is we're challenging this exam, we're saying it's not job-related, and it had a disparate impact overall, without pointing out any particular appointments, and time passes, you file the identical claim after you've been given your 90 days to sue, you don't mention that there are any new appointments. Let's say the discriminatory practice is you can't get a job here unless you grew up in some particular county that's 95 percent white. And some black applies for a job, didn't grow up in that county, and the first time he decides to forget about it. The second time, same thing, same thing happens. It's the same claim in terms of saying it's disparate impact against blacks to only appoint people who grew up in that county. It's the same in that sense, but it's not the same discriminatory act. He's only challenging the 1975 failure at Hiram, not the 1970 failure at Hiram. I made up bad dates because the law has changed a lot. And I don't want to belabor this because there are other things I'd like to talk about, but I think the city's position is, and the case law I believe supports this, you've got to allege some new act. And there is no new act alleged in any of these charges. There's a new use of the list. Excuse me? Each time a new set of promotions is made. That's exactly what Lewis said is the new practice. I understand that, Your Honor. It's a new use of an old discriminatory practice. Yes. There is no new allegation in the second charges of any further use of the list. Okay. Okay. So let me ask you, put aside timeliness then. I thought the district court's ruling on disparate impact was mainly that, well, everybody was eligible, so how could there be a disparate impact? And I thought that was the main ground on which the district court relied. That is the main ground. But I think also under the theory, if you just take a look at the promotional rate, the city has demonstrated there's no disparate impact. Well, hang on. So, I mean, that ruling, if we're just going to say, well, the fact that everybody was eligible, no disparate impact, that strikes me as legally flawed. And so most of what you started off talking about, it sounded to me like were factual issues that the district court hasn't really grappled with, not at least in any detail. And why wouldn't we just remand back? If we decide that the claims were timely and this eligible, everybody was eligible rationale isn't legally viable, why wouldn't we just send the case back? Well, I think the rationale of the district court is viable, and in part because we just discussed factually. Well, if we don't agree it's viable, then we have to kind of get into the weeds of whether there's statistical significance here, whether the rate. And so I take it your argument would then be, well, look at the record, because there's no showing of statistical significance or any other measure of disparate impact, I suppose then determinate would be to affirm on that basis. If we were to reject the district court's somewhat sketchy rationale. And I think there are other rationales that support affirmance in the city's position, which is to look, as the plaintiff suggests, at the promotional rate versus eligibility. I just walked you through what the evidence is there. And the other factor here is that the other issue that I wanted to mention at the outset is the Ricci case, which says that even where there is a statistically disparate impact, there is a robust defense for employers where there is a job-related exam, and this exam was job-related. This case, and there's ample evidence in the record on this as well, that there were complaints that plaintiffs have brought forward about certain components of the exam. And the Supreme Court in Ricci said exams don't need to be perfect. There are always going to be individuals, such as there are in this case, who come forward and quibble with one component of the exam or not, whether this is the best practice or the existing practice to fight this kind of fire scene. And whether there are issues with respect to some of the questions, whether it's with respect to some of the scoring. But those issues were all present in Ricci, and the Court said that those were not enough to constitute an exam that was not job-related. And that's a defense even if there's disparate impact in this case. And the plaintiffs haven't offered any evidence that really goes beyond anything that wasn't previously addressed in the Ricci case, that the job-related exam overcomes the problems that may exist statistically, because Ricci wanted employers not to be constantly chasing after the statistical analysis. And that's particularly important here because of the small sample size. I will note, Your Honor, that in Contreras, there were 57 or 58 candidates as compared to the 63 here. And the Court noted this flip-flop issue. And there's another Ninth Circuit case, Stout v. Potter, involving approximately 38 candidates, where in a footnote in that decision, I believe it's footnote 3, it noted that there was a flip-flop of one candidate, that the statistical disparate impact would disappear. And this Court said that we're not going to find a disparate impact on the caprice of the flip-flop of one candidate from one side of the selection to the other side of the selection. So there's also this robust defense under Ricci. And this was a job-related exam. We've demonstrated the process. It's in the record from the city's exam individuals. And I can find those sites to the record for you about the process of doing a job analysis, of using the job analysis to develop the exam questions, to rely upon members of the department to come up with a scoring key for scoring the exam, of relying upon outside individuals from other departments to come in and to score these exams blind, not knowing the race, gender, age, or anything about any of the candidates. And that's all in here. And that's the kind of process that Ricci said makes for a job-related exam. And I think that argument would mean that even if the expert is right that there's a statistically significant mathematical analysis that shows that it's unlikely that blacks would have been promoted at this much lower rate than whites, even if that's right, I think your analysis would say it doesn't matter because these are not random people. It's not like pulling marbles out of a can. They were promoted or not promoted based on a job-related test, which is unchallenged. And therefore, or even if it is challenged, you say it's still job-related. And therefore, it doesn't matter that there's a statistical, statistically significant disparate impact. That's exactly right. I think that's exactly what Ricci holds. And the evidence of, at least in part, of the job-relatedness of the exam is in the record at ER 130 to 132, 751 to 824, and 67 to 81, which is part of the ---- Read those numbers once more. 67 to 81, 130 to 132, 751 to 824. And that's the testimony both from the city's, the head of the exam unit who developed the exam, as well as an outside expert who we relied upon to look at the exam after the fact and evaluate the job-relatedness of the exam. And also in there, the outside expert also did his own statistical analysis of the 2001 exams, and he found that there was no disparate impact. So I think there are a variety of levels on which this Court can affirm the ruling below. Thank you very much, counsel. I think, I'm not sure you reserved, but let's go ahead and put a minute on the clock and give you an opportunity to respond. As to some of the issues raised, I would like to first say that the plaintiffs do contest the job-relatedness of this examination. And we have an expert report from Dr. Zedick, who was the expert who oversaw the exams during the consent decree, and he finds that this exam is invalidating, should not be relied upon to make appointments. Also, we have admissions from the city's own high-ranking chiefs who said on the answer key, saying that the key is not job-related because it was tampered with, it was changed from what they originally came up with, and that the anchors that were put on the key do not relate to the job that is performed by battalion chiefs. So we have opinions from an outside expert from the city's own high-ranking chiefs who said on the key that this exam is not job-related and should not be relied upon. And all of these are questions of fact for the jury. This own circuit has said that validity of an examination is a question of fact for a jury. Overall, the fact, the evidence here before this Court, I would ask that the Court to overturn the motion for summary judgment. The matters are timely. Issues of fact are here as to job-relatedness. There's been no concession. The city's own expert concedes that there's disparate impact. They now rely upon a date after the complaint when this Court has said that any disparate impact. You only look at the time frame when the alleged act occurred. So based on all of those things, I would ask the Court to reverse the ruling and actually send this matter back as a question of fact that should be determined by a jury as to job-related. There are many issues that are not contested or that have been conceded by the city employees. Thank you very much. Thank you very much, Counsel. That will be submitted for a decision by this Court.
judges: Kleinfeld, Nguyen, Watford